UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 1:13CR 39 SNLJ |
| ESAD BEKRIC, | ) ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

The defendant has filed Defendant's Motion to Suppress Statements and Evidence (Document #24) in which he asks that the court suppress any and all physical evidence seized from him and any statements made by him to law enforcement officers which the government intends to offer as evidence at trial. He contends that the physical evidence and statements were obtained in violation of his rights under the Fourth and Fifth Amendments to the Constitution of the United States.

The defendant relates that approximately 200 pounds of marijuana, records concerning Mr. Bekric's travels, a cell phone and its contents were seized by the government. In addition, Mr. Bekric was questioned both at the scene of the stop and later at the Missouri Highway Patrol Office.

The defendant claims that the cell phone in this case was searched without a search warrant. The evidence showed that the defendant's assertion is incorrect. Instead, a search warrant for the search of the cell phone and the refrigeration unit of the trailer was obtained.

The defendant claims that the questioning of Mr. Bekric at the scene of the stop went beyond any discussion relating to his reasons for stopping and included examination of his driver's log book which led to the trooper detaining the tractor trailer awaiting the arrival of a K-9 unit to conduct an

exterior sniff of the trailer.

**Factual Background**

On March 3, 2013, Cpl. Jeremy Stewart of the Missouri Highway Patrol was working a Ruse Drug Checkpoint on Interstate 55 at the 27 mile marker in Pemiscot County, Missouri. A Drug Ruse Checkpoint is an investigative tool whereby law enforcement officers will post signs warning that a drug checkpoint is ahead. There is really no checkpoint. Vehicles that take an exit to avoid the checkpoint are closely observed to determine whether reasonable suspicion develops to pull them over.

At approximately 7:55 P.M., Cpl. Stewart saw a tractor trailer rig take the exit and make a turn onto Route A. The driver ran the stop sign when he made the turn at the intersection. Right after the driver passed Stewart, whose patrol car was parked at the side of the road, the driver stopped his truck in the middle of the roadway and activated his flashers. Stewart made a U-turn and drove the 50 feet to where the tractor trailer rig had stopped. The driver got out of his car and walked to Stewart's vehicle. Although the defendant had not been pulled over by Cpl. Stewart, and the defendant had initiated the contact with Cpl. Stewart, the officer felt that he was making a traffic stop of the defendant at that point for running the stop sign. Stopping the truck in the middle of the road was another traffic offense. Stewart asked Bekric to have a seat in the patrol car.

The driver, Esad Bekric, told Cpl. Stewart that he was having problems with the "reefer unit" on his trailer overheating. As Stewart and Bekric spoke, Stewart conducted computer inquiries on Bekric and his truck. At 8:04 P.M. (the time is determined by Government Exhibit 1) at the defendant's urging, Stewart paused in the traffic investigation so Bekric could put fluid in his "reefer"

unit. After doing so, they returned to the patrol car, where Stewart continued to investigate the traffic offense by looking at Bekric's paperwork pertaining to his trip and his truck. Stewart also questioned Bekric about his criminal history. Stewart found it suspicious that the truck did not really seem to be overheated, and Bekric's story about the time frame during which he had loaded his truck with limes and left on his trip did not seem consistent with normal procedure for the trucking industry. Also, Bekric mentioned that he had been jailed in Texas in 2012 for having marijuana in his trailer.

While Bekric was talking with Stewart, a different officer, Trooper Crank, used his K-9, Edy, to check the air around the tractor trailer rig. The dog alerted on the trailer. The dog alerted for the presence of drugs one minute after arriving at the scene, about nine minutes from the time Bekric had gotten out of his cab and the traffic stop began. Edy is a four-year-old dog, certified in detecting controlled substances, including marijuana. Edy is tested for accuracy in controlled tests each year, and has consistently displayed 100% accuracy in detecting drugs.

After the dog alerted, Stewart asked Bekric for consent to search the truck and trailer. Stewart asked, "Sir, do you have anything in the trailer? May I look inside?" Bekric answered, "You're welcome to." Stewart confirmed, "Do I have your permission?" Bekric replied, "Yes, sir." This conversation occurred no more than ten minutes after Bekric had gotten out of his truck and come back to Stewart's car.

Stewart testified that investigating a traffic offense involving a tractor trailer rig takes longer than a traffic stop of a car. He said it usually takes at least fifteen minutes to complete the paperwork for a traffic stop of a truck.

During the search, the officers located a black bundle of marijuana inside the reefer unit.

Trooper David Crank identified the plant material as marijuana, and Stewart arrested Bekric. From the time Bekric had gotten out of his truck until the time he was arrested was no more than ten to twelve minutes. At 8:11 P.M., Stewart radioed in that they had received a positive alert from the K-9. At 8:15 P.M., he radioed in that a white male was in custody.

The tractor trailer rig was driven to the Sikeston satellite station of the Missouri Highway Patrol, where the officers conducted a more extensive search. Altogether, 200 pounds of marijuana were found inside the reefer unit.

Stewart collected Bekric's cell phone from the cab of the truck.

The defendant had several conversations with the investigating officers. He claimed he did not know the marijuana was in the truck.

The defendant's comments at the scene during the traffic stop were recorded by the video camera in Cpl. Stewart's patrol car.

When Stewart arrested him on the side of the road, after marijuana was found in the trailer, Stewart advised Bekric of his Miranda rights by using a standard Miranda card.

Less than two hours later, Bekric was interviewed by Travis D. Templemire, a narcotics officer with the Missouri High Patrol. The interview took place on March 3, 2013, at 10:00 P.M. at the Sikeston Satellite office of the Missouri Highway Patrol. Templemire advised Bekric of his Miranda rights before beginning the interview and recorded the subsequent interview.

Later, about 1:35 in the morning, Stewart spoke to Bekric again. He brought Bekric's cell phone to Bekric, and Bekric located and showed Stewart two or three photographs inside the phone. The photographs depicted a false wall that had been used to hide marijuana in a trailer Bekric had been pulling when stopped in Texas several months earlier.

- 4 -

Travis Templemire subsequently obtained a search warrant for a search of the defendant's cell phone. All evidence seized from the telephone was collected under the authority of the search warrant.

## Discussion

The stop of Mr. Bekric's truck by Mr. Bekric arose as a result of a Drug Ruse Checkpoint which occurred on March 3, 2013. This type of checkpoint has been approved by the courts. <u>United States v. Williams</u>, 359 F.3d 1019 (8th Cir. 2003); <u>State v. Mack</u>, 66 S.W.3d 706 (Mo. banc 2002).

The factual background relates that the defendant took the exit on Interstate 55 to turn onto Route A. He ran a stop sign when he made the turn at the intersection of Route A. The defendant ran past Corporal Jeremy Stewart of Missouri Highway Patrol parked at the side of the road and then stopped his truck in the middle of the roadway and activated his flashers. The officer made a u-turn and drove to where the tractor trailer rig had stopped. The driver of the tractor got out of his truck and walked to Corporal Stewart's vehicle. He had not been pulled over by Corporal Stewart, and the driver initiated the contact with Corporal Stewart. The encounter did not begin as a traffic stop. The patrolman had not turned on his red lights when the truck stopped, but when the defendant turned on his flashers, Corporal Stewart did turn on his lights and made contact with the driver. (Tr. 12). When Corporal Stewart pulled up in his vehicle, the defendant quickly exited his truck and came walking back to the patrol car. Mr. Bekric told the officer that he was having problems with his reefer unit which is on his trailer. The reefer unit is the cooler unit that cools the trailer. The officer asked the defendant what was going on with his reefer unit. Mr. Bekric stated that it was making a sound or was overheating. The officer did not recall exactly what Mr. Bekric told him the complaint was. (Tr. 13). The officer asked Mr. Bekric to have a seat in his patrol car. Corporal Stewart, at

that point, was making a traffic stop of Mr. Bekric for having run a stop sign.

The officer began a computer check on the driver and called in on the radio and gave the operator information on Mr. Bekric. Mr. Bekric's driver's license was valid, but he did not have any of his paperwork with him. He did not have his log book, his registration or his shipping papers with him. The officer told him that he really needed to see those items as well. Mr. Bekric kept talking about his trailer, that he was having problems with his trailer. Bekric said he wanted to get into his truck, grab some coolant from his truck, pour it into the reefer unit and that way it could cool down the reefer unit, so the officer permitted him to do that. (Tr. 14).

At the evidentiary hearing, Corporal Stewart testified that when an officer pulls over a truck for a traffic offense, it is important as part of the traffic offense to look at the person's log book and registration papers. The purpose is to see if the driver's log book and his shipping papers back each other up. From the shipping papers an officer can tell when the driver was off duty, whether he was loading at that time or not. One can also see if the driver has a legitimate right to the load that he is carrying and that it is not stolen. If the driver tells the officer the load is going to Ohio, then that can be verified by looking at the paperwork. Officer Stewart testified that those questions are not asked for drug reasons but for the reasons associated with a traffic stop of a truck. The officer was a bit suspicious of Bekric's complaint about the overheated condition of the reefer unit. He testified that on the outside of the reefer unit, there is a temperature gauge and it will tell the person what the temperature is inside the truck. Based on what the driver told Officer Stewart and looking at his shipping papers, it became clear that the reefer unit was supposed to be at 45 degrees and it was at 45 degrees. It was not overheating.

After the defendant put the liquid, which was water and not coolant, into the reefer unit, he

retrieved his paperwork, log book, shipping papers and registration, and they went back to the patrol car, so the officer could review the paperwork. (Tr. 16).

Corporal Stewart testified that during his conversation with the driver, when he was asking about Mr. Bekric's trip and questioning him about his paperwork, it came up that he had been arrested last year in South Texas for something that was found in his trailer.

At that time, K-9 Officer David Crank arrived at the scene. While Corporal Stewart was talking to Mr. Bekric, Officer Crank notified Corporal Stewart that his drug dog had made an alert. Nine minutes had elapsed from when Mr. Bekric had gotten out of his cab and come back towards Officer Stewart's vehicle until the time when Officer Crank notified Stewart about the alert by his drug dog. At that point, Corporal Stewart had not finished the citation. (Tr. 17). Corporal Stewart was asked, in his experience, how long does it routinely take when he pulls over a truck on a routine traffic ticket. Stewart responded, in his experience, it takes at least fifteen minutes. He said that it takes longer because of the paperwork on the load, as well as the log book. The officers are supposed to go back the last seven days in the log book to verify that truckers had been operating within their standards.

Corporal Stewart then informed Mr. Bekric that the K-9 had alerted on the trailer and asked him if there was anything illegal in the trailer. Mr. Bekric said no. Stewart asked Bekric's permission to search the truck, the trailer and its contents, and Bekric allowed him to search. (Tr. 18).

There was a padlock on the truck, and Mr. Bekric opened the padlock. He gave Corporal Stewart a set of keys, and the doors of the trailer were opened. Trooper Crank was able to get on top of the load and crawl from the back to the front to inspect the load to see if there was anything illegal in there. Around the reefer unit, Officer Crank noticed several black bundles that had nothing

to do with the load, which was actually limes. Crank inspected all the bundles and dug into one of the black bundles, and it appeared that it was marijuana inside of the bundle. The defendant was then arrested. Corporal Stewart testified that from the time Bekric stopped his tractor and trailer to the time that he was arrested, ten to twelve minutes had elapsed. (Tr. 20).

The truck was then driven to the Missouri Department of Transportation building in Sikeston, Missouri. The officers unloaded the produce up to the front of the trailer where the reefer unit sits. The reefer unit is covered by a plastic shield. On that plastic shield, there was evidence that there were new screws in the plastic shield, and it appeared that the shield had been taken off before. The plastic shield was removed, and behind it were 47 or 48 black bundles that contained marijuana. (Tr. 21). The total amount of the marijuana weighed approximately 200 pounds. (Tr. 30).

In the cab of the vehicle, officers found a cell phone. The officers seized the cell phone. (Tr. 22).

The defendant was transported to the Highway Patrol Satellite Office in Sikeston. (Tr. 20).

Corporal Stewart later in the evening spoke with Mr. Bekric. In the meantime, Mr. Bekric had been interviewed by Trooper Travis Templemire, who had administered the Miranda warnings. It was three hours after Trooper Templemire's interview with the defendant that Corporal Stewart spoke again with him. (Tr. 22).

Corporal Stewart asked Mr. Bekric again about his load – where he picked it up, whether the trailer was unattended at that point during the trip -- and they spoke about Bekric's cell phone. Corporal Stewart asked to look at the cell phone, any pictures he had on there, and Mr. Bekric allowed him to do so. (Tr. 23). Bekric showed Stewart how to go to the pictures on his cell phone. There were two or three pictures which related to the incident Bekric had told Stewart about from

either 2011 or 2010, where he was arrested in South Texas. On that occasion, there was a false wall in the trailer that he was driving or that he was pulling, and in the trailer marijuana was found. (Tr. 23).

In <u>United States v. Jones</u>, 269 F.3d 919 (8th Cir. 2001), the Court of Appeals for the Eighth Circuit held:

> ... our case law teaches us that a police officer, incident to investigating a lawful traffic stop, may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose.

269 F.3d 919, 924.

"The officer may detain the driver as long as reasonably necessary to conduct these activities and to issue a warning or citation." <u>Id</u>.

With respect to the defendant's motion to suppress evidence, the 200 pounds of marijuana were found legally following consent by the defendant, and the alert by Trooper Crank's drug dog. The alert of a drug dog provides probable cause for the search of a vehicle. <u>Illinois v. Cabelles</u>, 125 S.Ct. 834 (2005). The use of dogs to perform a "sniff test" for drugs represents a minimal intrusion and, therefore, does not constitute a search. <u>United States v. Place</u>, 462 U.S. 696, 707 (1983); <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 40 (2000) (no search when canine sniffs exterior of cars stopped at city drug interdiction checkpoint). <u>See</u> <u>also</u> <u>United States v. Suitt</u>, 569 F.3d 867, 873 (8th Cir. 2009).

With regard to the records concerning Mr. Bekric's travels, Corporal Stewart testified that Mr. Bekric was required by law to maintain those records and if a police officer asks to inspect them,

to show them to the officer. (Tr. 46). Title 49 Code of Federal Regulations, Part 395.8 adopted as Missouri law by 307.400 RSMo. See also 304.230 RSMo.

Records concerning Mr. Bekric's travels were seized as incident to a valid arrest. The same is true of the cell phone which was seized.

With regard to questioning Mr. Bekric at the scene of the stop, as noted in the Jones decision, any discussion of the defendant's log and papers was appropriate. A computer search of the defendant's criminal history is permissible.

Later, the defendant was interviewed by Officer Travis Templemire.

## Interview of Defendant by Travis Templemire

Officer Travis Templemire is a Narcotics Detective with the Missouri State Highway Patrol. He was assigned to the SEMO Drug Task Force. He interviewed Mr. Bekric at the Troop E Satellite Station in Sikeston. Detective Templemire advised Mr. Bekric of his Miranda rights by reading them to Mr. Bekric, and Mr. Bekric signed his name at the bottom of an Advice of Rights form, Government's Exhibit #8. After each of the Miranda warnings, there is a blank at which the initials "E.B." is filled in. Below the individual rights, there is the statement "I UNDERSTAND MY RIGHTS." That statement is followed by "Esad Bekric." Detective Templemire testified that Mr. Bekric "signed his name at the bottom stating that he understood each and every one of them." (Tr. 88).

The whole interview of Mr. Bekric by Detective Templemire occurred after Templemire had given Bekric the Miranda rights. (Tr. 89).

Government's Exhibit #9 was introduced at the evidentiary hearing. It is an Application for a Search Warrant for the cellular telephone possessed by Mr. Bekric and the refrigerator unit at the

top front of the trailer.  The application and affidavit were presented to Judge Scott Horman, an Associate Circuit Judge for Scott County, and Judge Horman issued the search warrant on March 5, 2013, at 3:38 P.M. in the afternoon.

The Application for the Search Warrant and Affidavit were presented to Judge Horman after Detective Templemire spoke with the Prosecuting Attorney of Scott County.  The Prosecuting Attorney, Paul Boyd, read and approved the application as to form and content.

### **Conclusion**

The 200 pounds of marijuana was found after the drug dog alerted to the presence of illegal drugs in the trailer hauled by Mr. Bekric.  After the alert, the defendant consented to the search of the trailer.  Records concerning Mr. Bekric's travels were given to Corporal Stewart for inspection pursuant to Missouri law.  Pictures on the cell phone were shown voluntarily to Corporal Stewart by the defendant.  A search warrant for a search of the cell phone was requested and issued by Judge Horman, Associate Circuit Judge for Scott County.  Conversations between Mr. Bekric and Corporal Stewart were pursuant to permissible inquiries by a law officer of a traffic violator under Missouri law.  State v. Jones, 269 F.3d 919, 925.  After the marijuana was found, the defendant was placed under arrest and he was read his Miranda rights.  The defendant was interviewed by Detective Travis Templemire of the Missouri State Highway Patrol after the administration of the Miranda warnings again.  A search warrant was issued by Judge Scott Horman for the search of the defendant's cell phone as well as the "reefer" unit which also contained a computer.  (Tr. 92).

**IT IS, THEREFORE, RECOMMENDED** that Defendant's Motion to Suppress Statements

and Evidence (Document #24) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Lewis M. Blanton
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of September, 2013.